UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------x
UNITED STATES OF AMERICA,

                Plaintiff,                    MEMORANDUM AND ORDER

    -against-                               12 CR 553 (ILG)

YING WAI PHILLIP NG and
PUI KUEN NG,

                Defendants.
------------------------------------------------x
GLASSER, United States District Judge:

      Pending before the Court are the defendants' motions to withdraw their waivers of Indictment, to withdraw their pleas of guilty to an Information, and for an order that would dismiss that Information.

## FACTS

      On September 19, 2012, Mr. and Mrs. Ng (the "defendants") waived indictment and pleaded guilty to the Information charging them with conspiracy to commit mail fraud in violation of 18 U.S.C. § 1349. The Information alleged in substance that the defendants conspired to devise a scheme to defraud prospective employers by causing to be mailed and delivered by the United States Postal Services envelopes sent by the Department of Motor Vehicles ("DMV") containing fraudulently obtained Commercial Drivers' Licenses ("CDLs") and commercial CDL class B permits.

      The factual background leading to that charge is essentially as follows: the defendants owned and operated a driving school serving primarily Chinese immigrants. In addition to providing legitimate schooling to would be drivers, they also devised a scheme to assist Chinese-speaking applicants with limited English speaking proficiency ("LEP") to pass the written portion of the CDL test. That test was given only in English

and Spanish and interpreters were not permitted to assist test-takers.  Persons not proficient in English or Spanish are thus precluded from taking the CDL test and obtaining a CDL license.  There is no evidence that either Mr. or Mrs. Ng were ever contacted by an employer.  There is no allegation that they guaranteed employment to their students or received any part of their salary and there is no evidence that any were actually employed and actually received any salary.  In pleading guilty, the defendants' allocuted to those facts.  The fraudulent details of the scheme by which the LEP customers were assisted to pass the written CDL test are set out in detail in the Complaint and Affidavit in Support of Arrest Warrants.  Dkt. No. 1.  It suffices to say that the scheme was cleverly designed involving a concealed camera on the person of the CDL test-taker conveying an image of the test to a receiver in a nearby van in which Mr. Ng was seated and transmitted the answers to a listening device with which the test-taker was also fitted.  The scheme was plainly one to fraudulently obtain from the DMV a CDL license.  The applicants passing the written test then received a permit by mail allowing them to take the driving test, which they passed legitimately.  The CDL was then mailed to the applicant.

It is the mailing of the permit and the CDL by the DMV to the defendants that triggered the violation of the mail fraud statute to which they pleaded guilty.  The parties appeared for sentencing on April 11, 2013.  Prior to addressing exceptions and objections to the Presentence Report, the Court, sua sponte, expressed concern about the guilty pleas and the sufficiency of the Information in light of Cleveland v. United States, 531 U.S. 12 (2000), which decided that a license was not "property" within the meaning of the mail fraud statute, 18 U.S.C. § 1341, in the hands of the issuing

2

governmental agency. The parties were requested to brief the issue. Letter memoranda were filed in response on May 29th, Dkt. Nos. 56, 58; June 5th, Dkt. Nos. 59, 60, 61; June 25th, Dkt. No. 63; July 9th, Dkt. No. 64; and July 18th, Dkt. No. 66.

## DISCUSSION

The issues were briefed extensively with lucid and vigorously presented arguments, exhaustively researched in support of and opposed to the motions. The question raised by the Court at sentencing was prompted by Justice Ginsberg's conclusion in Cleveland, in which she wrote that

> § 1341 requires the object of the fraud to be "property" in the victim's hands and that a Louisiana video poker license in the State's hands is not "property" under § 1341. <u>Absent clear statement by Congress, we will not read the mail fraud statute to place under federal superintendence a vast array of conduct traditionally policed by the States.</u>

531 U.S. at 26–27 (emphasis added).

It is not disputed that the CDL license was not "property" in the hands of the New York DMV and that the defendants would not have violated the mail fraud statute which proscribes obtaining "money or property by means of false or fraudulent pretenses . . . ." The government, cognizant of Cleveland had an undercover agent employed by Homeland Security Investigations ("UC") visit the defendants' school. He explained to Mrs. Ng that he was not proficient in English, had an offer of a job to drive a bus, and was concerned about passing the written CDL test. She explained that her husband would assist him to pass it. The UC then expressed concern that his prospective employer, knowing of his limited English, would wonder how he got the CDL and was assured by her that, should the employer call to inquire she would not tell how he passed

3

the test.  At the proceeding at which they pleaded guilty, the defendants acknowledged knowing that when the CDL test was passed, a permit would be mailed to the applicant permitting him to take the driving test, and if he passed that, the CDL would be mailed to him and enable him to get a job as a commercial driver.  Those acknowledgments were also elicited by the Court from the defendants when allocuting to the plea, at the request of the government, to make explicit that which was intrinsically inherent in the event.  There is no doubt that the defendants knew that a person seeking their assistance to get a CDL is because he wanted to get a job driving a commercial vehicle and not to frame and hang it on a wall.

That this Information placed under "federal superintendence . . . conduct traditionally policed by" the State of New York is made stunningly clear by § 392 of N.Y. Vehicle & Traffic Law, which provides in relevant part:

> Any person knowingly making a false statement in an application for any document issued by the commissioner . . . or who shall deceive or substitute or cause another to deceive or substitute in connection with any examination hereunder . . . shall be guilty of a misdemeanor.  A person who operates a motor vehicle upon the public highway displaying or using any document that he or she knows has been obtained in violation of this section, shall be guilty of a misdemeanor.

In raising the issue sua sponte, the Court was not indifferent to the most oft-cited case, Badders v. United States, 240 U.S. 391 (1916), in which Justice Holmes wrote that

> [t]he overt act of putting a letter into the postoffice of the United States is a matter that Congress may regulate. Whatever the limits to its power, it may forbid any such acts done in furtherance of a scheme that it regards as contrary to public policy, whether it can forbid the scheme or not. . . . The acts alleged have been found to have been done for the purpose of executing the scheme, and there would be no ground for contending, if it were argued, that they were too

4

> remotely connected with the scheme for the law to deal with them.

Id. at 393–94. The Court is also not indifferent to the Supreme Court cases decided after Badders which lend validity to the observation that it is one thing to put a rule into a nutshell, it is another thing to keep it there. See W. Barton Leach, Perpetuities in a Nutshell, 51 Harv. L. Rev. 638 (1938). I state the decision in those cases without burdening this Order with an extended discussion of the facts in each, relying instead on what is surely a fiction but a useful one, namely, that familiarity with them will be assumed. In Kann v. United States, 323 U.S. 88 (1944), Kann's conviction of mail fraud was reversed by the Court's holding that the mailings were not "for the purpose of executing the fraud," the scheme having reached fruition. The Court also observed that "[t]he federal mail fraud statute does not purport to reach all frauds, but only those limited instances in which the use of the mails is a part of the execution of the fraud." Id. at 95.

In Pereira v. United States, 347 U.S. 1 (1953), the defendant's conviction was affirmed by the Court holding that a mailing need not be an "essential element" of the fraudulent scheme to support a mail fraud conviction if the mailing was "incident to an essential part of the scheme." Addressing the "cause to be mailed" language of the statute, the Court wrote that a mailing is knowingly caused "[w]here one does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended." Id. at 8–9.

In Parr v. United States, 363 U.S. 370 (1960), the defendants misappropriated

school district tax funds.  The mailings underlying the mail fraud charged were letters associated with the payment of taxes the defendant caused to be mailed and other mailings pertaining to the district's credit card bills.  As regards the tax mailings, the Court held § 1341 inapplicable to mailings made "under the imperative command of duty imposed by state law."  Id. at 391.  The Court also held § 1341 inapplicable to the fraudulent use of the district's credit cards because the scheme had already reached fruition when the defendants received the goods they fraudulently charged.  Id. at 393.

In United States v. Sampson, 371 U.S. 75 (1962), the Court held that a § 1341 mailing could occur even after the proceeds of the scheme were obtained and still be regarded as being for the purpose of executing the scheme.

In United States v. Maze, 414 U.S. 395 (1974), the defendant used stolen credit cards in his stay in motels while traveling through four states.  The mailing requirement of § 1341 was satisfied, the government argued, because he knew each motel would mail the credit card slips to the issuing bank.  The Court held that the mailings were not sufficiently related to the scheme to defraud to make the statute applicable.  The Court wrote that the mailing must be for the purpose of executing the scheme and that it was "not necessary that the scheme contemplate the use of the mails as an essential element."  Id. at 400.

Finally, in Schmuck v. United States, 489 U.S. 705 (1989), on which the government places great reliance, the defendant, an automobile wholesaler, rolled back the odometer on cars he sold to retail car dealers who, in turn, sold them to their customers.  A Wisconsin statute made tampering with an odometer a misdemeanor.  The manipulated low mileages inflated the value of the cars as they moved from

purchaser to purchaser.  The mail fraud conviction was based on the mailings transferring title to the cars to the defrauded retail purchasers.  The Court held that the mailings could be "for the purpose of executing" the scheme even if they weren't made by the defendant, the title registrations (the content of the mailings) did not deceive the duped purchasers, and were after the cars were paid for by the victims.  The Court quoted selectively from Pereira that a mailing need only be "incident to an essential part of the scheme" to be part of the execution of the fraud or "a step in the plot," citing Badders.  Id. at 710–11.

Those six cases are the touchstones for the countless lower court cases cited by the parties in advancing their respective positions, and they are not easily reconciled.  A close reading of those cases will reveal observations in one difficult to reconcile with observations in another.  The irreconcilability is perhaps best explained by the wise observation by Justice Frankfurter that "in matters of statutory construction . . . it makes a great deal of difference whether you start with an answer or with a problem."  Felix Frankfurter, Some Reflections on the Reading of Statutes, 47 Colum. L. Rev. 527, 529 (1947).

Returning to the issue that prompted this exploration, whether the Court should assume federal jurisdiction over conduct traditionally policed by the states by invoking the mail fraud statute, Justice Ginsberg, writing for a unanimous Court, wrote that it should not absent a clear intent by Congress that it should.  Her view was foreshadowed by the dissenting opinion eleven years earlier by Justice Scalia in Schmuck, supra at 722–23.  On behalf of himself and Justices Brennan, Marshall, and O'Connor, he wrote:

> The purpose of the mail fraud statute is "to prevent the post

7

> office from being used to carry [fraudulent schemes] into effect." The law does not establish a general federal remedy against fraudulent conduct, with use of the mails as the jurisdictional hook, but reaches only those limited instances in which the use of the mails is a <u>part of the execution of the fraud</u>, leaving all other cases to be dealt with by appropriate state law. (emphasis added). In other words, it is mail fraud, not mail and fraud, that incurs liability. This federal statute is not violated by a fraudulent scheme in which, at some point, a mailing happens to occur — <u>nor even by one in which a mailing predictably and necessarily occurs. The mailing must be in furtherance of the fraud</u>. (emphasis in original and added).

(internal citations omitted)[1]. It would not be disputed that had the CDL been called for in person by the applicant, no federal crime would have been committed, but clearly a state crime would have been. It would also not be disputed that had the indictment charged the defendants, Mr. and Mrs. Ng, with the substantive crime of mail fraud, that indictment would have been dismissed for the same reason <u>Cleveland</u>'s indictment was—the CDL was never property in the possession of the victim, the DMV. The same result would have been reached had Mr. and Mrs. Ng alone been charged with conspiracy to obtain the CDL without more. <u>United States v. Dege</u>, 364 U.S. 51 (1960) (a husband and wife are legally capable of conspiring. The medieval rule that the personality of a married woman is merged into that of her husband so that they become one has long since lost its recognition). The jurisdictional hook that was required therefore was provided by the introduction of a third party, an undercover agent, who made it known to the defendants that he needed the CDL to be hired to drive a bus and had them say that if asked by his prospective employer they would not reveal that his

---

[1] An intimation of this concern may be found in <u>United States v. Sampson</u>, 371 U.S. 75, 83 (1962), in which Justice Douglas in a dissent wrote: "We should not struggle to uphold poorly drawn counts. To do so only encourages more federal prosecutions in fields that are essentially local."

license was fraudulently obtained.

That conversational interchange provided the hook upon which the government would hang the charge of conspiracy to commit mail fraud. The salary the prospective employer would pay the fraudulently licensed employee would thus be the "money or property" obtained by the scheme to defraud. That scheme, although devised to deceive the DMV, was expanded to snare the hypothetical employment by the acknowledgments extracted from the defendants by the UC. It should be noted that the UC was not a party to the conspiracy. He couldn't be. The Second Circuit has consistently held that a government agent could not be a party to a conspiracy. United States v. Barnes, 604 F.2d 121, 161 (2d Cir. 1979); United States v. Andrades, 169 F.3d 131, 135 (2d Cir. 1999). The charge was that they conspired "with others" who filled that role. A substantial portion of the brief was devoted to whether the "salary" to be paid was "money or property" obtained from the hypothetical employer, or whether what he lost was the "honest services" of the imaginary employee which would not be "property" within the meaning of the statute. Skilling v. United States, 130 S. Ct. 2896 (2010). For the reasons that follow, those issues need not be determined.

The distinction made between "mail fraud" and not "mail-and-fraud" as in Schmuck would, I suggest, be more sharply conveyed if stated to be the difference between fraud mail and mail-and-fraud. That, I would contend, would achieve the intent of Congress — protecting its postal service against its use as the instrumentality of fraud — as an element inherent in the scheme to defraud. The objective of the scheme here was to deceive the DMV and was accomplished when the CDL test was passed and not when the mailing occurred even if the "mailing predictably and necessarily occurs."

9

Putting the envelope in a mail box did not make the postal service an accomplice of the defendants nor did the acceptance of the envelopes for delivery by the postal service place upon them an imprimatur of the genuineness of their contents.

Revisiting the Information, it charges Mr. and Mrs. Ng with knowingly and intentionally conspiring with others to devise a scheme to defraud prospective employers of persons with CDLs to obtain money and property from them by false representations and causing to be mailed envelopes containing fraudulently obtained CDLs and CDL permits. The licenses and permits not being "property" in the hands of the victimized DMV, then the salary that would be paid to the prospective employee would be money obtained as a result of the mailing of the fraudulent licenses and permits. The causal connection between a mailing and the money or property obtained is "not a matter susceptible of geometric determination." Frankfurter dissenting in Parr, *supra* at 397.

The majority in Schmuck recognized that the "mail fraud statute does not purport to reach all frauds, but only those limited instances in which the use of the mails is a part of the execution of the fraud, leaving all other cases to be dealt with by appropriate state law," citing Kann, *supra*. "To be part of the execution of the fraud, however," the Court went on to write, "the use of the mails need not be an essential element of the scheme," citing Pereira. *supra*. The issues which pervade the voluminous litigation in which the mail fraud statute is charged are the meanings, with any degree of certainty or uniformity about what is part of the execution of the fraud and when is a mailing an essential element of a scheme?

The effect of the application of the mail fraud statute upon federal/state

relations reflected in Justice Scalia's dissent in Schmuck was echoed in Toulabi v. United States, 875 F.2d 122, 123 (7th Cir. 1989), in a case virtually identical to this one. There, the defendant fraudulently obtained licenses to drive a taxi in the city of Chicago and was convicted of mail fraud, the license having been mailed to him. In a collateral attack on his conviction, Judge Easterbrook wrote "Why the United States should be so interested in enforcing 'the laws of the City of Chicago' is something of a mystery. The mailings here were not the mechanism of deceit . . . Congress has never considered the proper role of federal law in prosecuting garden-variety governmental corruption." (emphasis added). Justice Ginsberg in Cleveland, in effect, substituted "conduct traditionally policed by the States" for "garden variety governmental corruption" and, writing for a unanimous court, wrote what merits repeating: "Absent clear statement by Congress, we will not read the mail fraud statute to place under federal superintendence a vast array of conduct traditionally policed by the States. Our holding means that Cleveland's § 1341 conviction must be vacated." (emphasis mine).

I find that view together with those of the four justices dissenting in Schmuck persuasive.

A reading of the Information by which the defendants were charged and the events leading up to it virtually compels the conclusion that it wasn't fraud by mail that was the gravamen of this offense. There were six introductory paragraphs to the "Conspiracy To Commit Mail Fraud" charged in paragraphs 6 and 7. There is only one sentence in those introductory paragraphs referring to mail: "The DMV mailed CDLs to applicants who passed the CDL road test." Par. 2. A reading of the Information in its entirety would surely compel the conclusion that the statute is not violated because "at

some point a mailing happened to occur."

## INTRODUCTION

At all times relevant to this Information, unless otherwise indicated:

### I. The Process For Obtaining Commercial Driver's Licenses From The New York State Department of Motor Vehicles

1.      The laws of the State of New York required that drivers of certain types of commercial vehicles, such as large buses, trucks and trailers, must possess a commercial driver's license ("CDL"). The New York State Department of Motor Vehicles (the "DMV") issued CDL,s in the State of New York, in accordance with regulations issued by the United States Department of Transportation.

2. Applicants seeking a CDL were required to pass a written test (the "CDL Written Test") covering various subjects related to safely driving large vehicles. The DMV offered the CDL Written Test in English and Spanish, and no other language. The CDL Written Test was in a multiple-choice format: each written question was followed by three possible answers, marked A through C. If an Applicant passed the CDL Written Test, <u>the DMV would mail the applicant</u> a Class B permit. After receiving the Class B permit, an Applicant was eligible to take the "CDL road test," the last step required

to receive a CDL. The DMV mailed CDLs to applicants who passed the CDL road test.

II. The Defendants And Their Business

3. N&Y Professional Service Line ("N&Y") was a commercial driving school in Brooklyn, New York. N&Y advertised its services as a driving school in New York City Chinese-language newspapers. The defendant YING WAI PHILLIP NG, also known as "Phillip Ng," owned N&Y and operated N&Y together with his wife, the defendant PUI KUEN NG.

III. The Scheme To Defraud

4. The defendant PUI KUEN NG solicited and received cash payments from individuals in the Chinese immigrant community (the "Applicants") who were incapable of passing the CDL Written Test because they could not sufficiently read or understand English. The Applicants paid PUI NG approximately $1,800 for N&Y's assistance in passing the CDL Written Test. After PUI KUEN NG received this cash payment from the Applicants, she directed the Applicants to the defendant YING WAI PHILLIP NG, also known as "Phillip Ng."

5. The defendant YING WAI PHILLIP NG, also known as "Phillip Ng," assisted the Applicants in cheating on the CDL

Written Test. While the Applicants took the CDL Written Test at a DMV Office, YING WAI PHILLIP NG remained in his minivan, in the parking lot outside. Before the Applicants took the test, YING WAI PHILLIP NG provided them with a paging device and a jacket containing a hidden video camera that wirelessly transmitted video images to a video screen in the minivan. YING WAI PHILLIP NG instructed the Applicants to point the hidden camera within the jacket sleeve at the test question, so YING WAI PHILLIP NG could see it on the video screen in the minivan. Using the hidden video camera and paging device, YING WAI PHILLIP NG instructed the Applicants which answers to give on the CDL Written Test.

6. The defendants YING WAI PHILLIP NG, also known as "Phillip Ng," and PUI KUEN NG perpetrated this scheme from at least September 2001 through March 2012, helping a total of approximately 500 Applicants pass the CDL Written Test by cheating in the manner described above. In at least some instances, YING WAI PHILLIP NG and PUI KEN NG knew that the Applicants planned to conceal their cheating on the CDL Written Test from their employers.

CONSPIRACY TO COMMIT MAIL FRAUD

7. The allegations in paragraphs one through six are

realleged and incorporated as if fully set forth in this paragraph.

8. In or about and between September 2001 and February 2012, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants YING WAI PHILLIP NG, also known as "Phillip Ng," and PUI KUEN NG, together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud prospective employers of individuals with CDLs, and to obtain money and property from those prospective employers by means of materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice, to place and to cause to be placed in a post office and authorized depository for mail matter, one or more matters and things to be sent and delivered by the United States Postal Service, to wit: envelopes sent by the DMV containing fraudulently obtained CDLs and commercial CDL Class B permits, contrary to Title 18, United States Code, Section 1341.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

Relevant portions of the conversation between the undercover agent (UC) and a defendant (NG) captured on a concealed "wire" the UC was wearing reflects the not too subtle introduction of "mail" into their meeting.

UC: *Okay*. My friend from the village wanted to hire me to drive [UI]

\* \* \*

UC: *Okay*. Because I'm afraid that he may find out that I don't know English and may be suspicious on how I have passed. [Stammering] If I refer your place to them, you...you are not going to tell them how I pass the test, right?

NG: Are you referring to your company?

UC: Yes.

NG: Your company is going to call and ask...about...

UC: For example, they may ask about me, saying...uh, this individual doesn't know English, how did he pass the test? You are not going to tell them how [I] pass the test, right?

NG: Not going to...you took the test yourself, right?

UC: Yes. *Okay*. Uh.

NG: [VO] They've all been done this way...this...I, I had given you the questions to study and taught you how to memorize them. I've handled all of them this way. I say that to every student. *Okay?*

UC: *Okay, okay*. Okay, okay.

Dkt. No. 56-3

\* \* \*

NG: You...know how to say...those in English. You do know how to say those in English for I have told you, huh?

SA: What? I did not hear you clearly.

NG: Eh, that day I told you those English [words] that you'll need to say. You already know how to say them, huh?

SA: Right, right, right. I remember, I remember. And also...

NG: (VO) *Okay*.

SA: What I want to tell you is, if my company ever calls you, you cannot tell them that it is fraudulent. You have to tell them that I took and passed it myself.

[Background conversation]

NG: [Chuckles] That is fine. You passed the test yourself. I have always told them that you passed the test yourself, *okay?* No problem. Ah...also, you need to bring your own license tomorrow, bring that...oh...oh...physical report (UI), *okay?* And also...oh...you give him/her $1800 tomorrow, *okay?*

SA: *Okay,* no problem. And also...

NG: Yeah?

SA: You said that 7 days after I took the test; [they] will mail it to my home, right? The temporary license? [Pause] About 7 days?

Dkt. No. 56-4

\*   \*   \*

UC: Mr. Wu, the...I...the test is not in Chinese, right?

NG: It's not.

UC: Then how can I take the test?

NG: (VO) (UI) I'll teach you later.

UC: *Okay*.

NG: (UI) You definitely will pass. It's very simple, *okay*.

UC: *Okay*.

NG: (UI)

UC: *Okay, okay.* (UI)

NG: (VO) (UI)

UC: I...after I take the test, are they going to send a temporary license to my house?

> NG: What?
>
> UC: If I pass the test…the temporary license, right?
>
> Dkt. No. 56-5

§ 392 of the NYVTL makes unmistakably clear that the State has embraced unto itself the regulation of the precise conduct of these defendants. That statute makes it a crime, as set out above, and significantly, concludes with "Nothing contained in this section shall prohibit the imposition of a charge of any other . . . provisions of law for any acts arising out of the same incident."

The New York Court of Appeals has held that the statute does not foreclose prosecution under a more general penal provision so long as it is applicable to that situation. People v. Sansanese, 17 N.Y.2d 302, 305 (1966). It is significant to note that § 392 is punishable as a misdemeanor unless the defendant is prosecuted under a more punitive provision. The mail fraud section, § 1341 is punishable as a felony by imprisonment up to 20 years. That striking disparity in punishment may be the answer to the "mystery" felt by Judge Easterbrook – with whom I agree that "The mailings here were not the mechanism of deceit" – of "why the United States should be so interested in enforcing the laws of [New York]."

A reading of the foregoing drives the Court to conclude that this was not the fraud by mail the statute was aimed at. Judges have had the prerogative to deviate from even the clearest statutory text when a given application would produce absurd results. John F. Manning, The Absurdity Doctrine, 116 Harv. L. Rev. 2387, 2388 (2003). Decades earlier, Judge Cardozo stated the matter in words that are exquisitely applicable here:

"Consequences cannot alter statutes, but may help to fix their meaning. Statutes must be so construed, if possible, that absurdity and mischief may be avoided." <u>In re Rouss</u>, 221 N.Y. 81, 91 (1917).

## Conclusion

For the reasons stated, the Court refrains from a consideration of other issues so ably argued orally and in letter briefs such as the "salary theory," and "honest services," among others. The motions pursuant to Rule 11(d)(2)(B) Fed. R. Cr. P. to withdraw their pleas of guilty are granted as are their motions to withdraw their waiver of Indictment and to dismiss the Information. This Order is stayed upon consent of the parties until November 8th, 2013.

SO ORDERED.

Dated:     Brooklyn, New York
           September 25, 2013

                                                                     S/
                                                I. Leo Glasser